# Exhibit A

**Environmental Protection Agency**                                    **§ 52.21**

**§ 52.16  Submission to Administrator.**

(a) All requests, reports, applications, submittals, and other communications to the Administrator pursuant to this part shall be submitted in duplicate and addressed to the appropriate Regional Office of the Environmental Protection Agency.

(b) The Regional Offices are as follows:

(1) Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. EPA Region 1, John F. Kennedy Federal Building, One Congress Street, Boston, MA 02203.

(2) New York, New Jersey, Puerto Rico, and Virgin Islands. EPA Region 2, 290 Broadway, New York, NY 10007–1866.

(3) Delaware, District of Columbia, Pennsylvania, Maryland, Virginia, and West Virginia. EPA Region 3, 841 Chestnut Building, Philadelphia, PA 19107.

(4) Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee. EPA Region 4, 345 Courtland Street, N.E., Atlanta, GA 30365.

(5) Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin. EPA Region 5, 77 West Jackson Boulevard, Chicago, IL 60604–3507.

(6) Arkansas, Louisiana, New Mexico, Oklahoma, and Texas. EPA Region 6, Fountain Place, 1445 Ross Avenue, Suite 1200, Dallas, TX 75202–2733.

(7) Iowa, Kansas, Missouri, and Nebraska. EPA Region 7, 726 Minnesota Avenue, Kansas City, KS 66101.

(8) Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming. EPA Region 8, 999 18th Street, Suite 500, Denver, CO 80202–2466.

(9) Arizona, California, Hawaii, Nevada, American Samoa, and Guam. EPA, Region 9, 75 Hawthorne Street, San Francisco, CA 94105.

(10) Alaska, Idaho, Oregon, and Washington. EPA, Region 10, 1200 6th Avenue, Seattle, WA 98101.

[61 FR 16061, Apr. 11, 1996]

**§ 52.17  Severability of provisions.**

The provisions promulgated in this part and the various applications thereof are distinct and severable. If any provision of this part or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or application of such provision to other persons or circumstances which can be given effect without the invalid provision or application.

[37 FR 19808, Sept. 22, 1972]

**§ 52.18  Abbreviations.**

Abbreviations used in this part shall be those set forth in part 60 of this chapter.

[38 FR 12698, May 14, 1973]

**§ 52.20  Attainment dates for national standards.**

Each subpart contains a section which specifies the latest dates by which national standards are to be attained in each region in the State. An attainment date which only refers to a month and a year (such as July 1975) shall be construed to mean the last day of the month in question. However, the specification of attainment dates for national standards does not relieve any State from the provisions of subpart N of this chapter which require all sources and categories of sources to comply with applicable requirements of the plan—

(a) As expeditiously as practicable where the requirement is part of a control strategy designed to attain a primary standard, and

(b) Within a reasonable time where the requirement is part of a control strategy designed to attain a secondary standard.

[37 FR 19808, Sept. 22, 1972, as amended at 39 FR 34535, Sept. 26, 1974; 51 FR 40676, Nov. 7, 1986]

**§ 52.21  Prevention of significant deterioration of air quality.**

(a) *Plan disapproval.* The provisions of this section are applicable to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards. Specific disapprovals are listed where applicable, in subparts B

13

through DDD of this part. The provisions of this section have been incorporated by reference into the applicable implementation plans for various States, as provided in subparts B through DDD of this part. Where this section is so incorporated, the provisions shall also be applicable to all lands owned by the Federal Goverment and Indian Reservations located in such State. No disapproval with respect to a State's failure to prevent significant deterioration of air quality shall invalidate or otherwise affect the obligations of States, emission sources, or other persons with respect to all portions of plans approved or promulgated under this part.

(b) *Definitions.* For the purposes of this section:

(1)(i) *Major stationary source* means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any pollutant subject to regulation under the Act: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, or nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants, fossil fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(b) Notwithstanding the stationary source size specified in paragraph (b)(1)(i) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more

of any air pollutant subject to regulation under the Act; or

(c) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source, if the changes would constitute a major stationary source by itself.

(ii) A major stationary source that is major for volatile organic compounds shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input, and

(*aa*) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) *Major modification* means any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act.

(ii) Any net emissions increase that is significant for volatile organic compounds shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(*a*) Routine maintenance, repair and replacement;

(*b*) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plant pursuant to the Federal Power Act;

(*c*) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(*d*) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(*e*) Use of an alternative fuel or raw material by a stationary source which:

(*1*) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166; or

(*2*) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(*f*) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166.

(*g*) Any change in ownership at a stationary source.

(*h*) The addition, replacement or use of a pollution control project at an existing electric utility steam generating unit, unless the Administrator determines that such addition, replacement, or use renders the unit less environmentally beneficial, or except:

(*1*) When the Administrator has reason to believe that the pollution control project would result in a significant net increase in representative actual annual emissions of any criteria pollutant over levels used for that source in the most recent air quality impact analysis in the area conducted for the purpose of title I, if any, and

(*2*) The Administrator determines that the increase will cause or contribute to a violation of any national ambient air quality standard or PSD increment, or visibility limitation.

(*i*) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(*1*) The State implementation plan for the State in which the project is located, and

(*2*) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(*j*) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(*k*) The reactivation of a very clean coal-fired electric utility steam generating unit.

(3)(i) *Net emissions increase* means the amount by which the sum of the following exceeds zero:

(*a*) Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and

(*b*) Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

(ii) An increase or decrease in actual emissions is contemporaneous with the

increase from the particular change only if it occurs between:

(*a*) The date five years before construction on the particular change commences; and

(*b*) The date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if the Administrator has not relied on it in issuing a permit for the source under this section, which permit is in effect when the increase in actual emissions from the particular change occurs.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxide, which occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available. With respect to particulate matter, only PM–10 emissions can be used to evaluate the net emissions increase for PM–10.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(*a*) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(*b*) It is federally enforceable at and after the time that actual construction on the particular change begins; and

(*c*) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(vii) [Reserved]

(viii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(4) *Potential to emit* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capac-

ity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) *Stationary source* means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act.

(6) *Building, structure, facility, or installation* means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same ''Major Group'' (i.e., which have the same first two digit code) as described in the *Standard Industrial Classification Manual, 1972,* as amended by the 1977 Supplement (U. S. Government Printing Office stock numbers 4101–0066 and 003–005–00176–0, respectively).

(7) *Emissions unit* means any part of a stationary source which emits or would have the potential to emit any pollutant subject to regulation under the Act.

(8) *Construction* means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) which would result in a change in actual emissions.

(9) *Commence* as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(10) *Necessary preconstruction approvals or permits* means those permits or approvals required under Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(11) *Begin actual construction* means, in general, initiation of physical onsite construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures. With respect to a change in method of operations, this term refers to those on-site activites other than preparatory activities which mark the initiation of the change.

(12) *Best available control technology* means an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR parts 60 and 61. If the Administrator determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) "Baseline concentration" means that ambient concentration level which exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a baseline date is established and shall include:

(a) The actual emissions representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section;

(b) The allowable emissions of major stationary sources which commenced construction before the major source baseline date but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(a) Actual emissions from any major stationary source on which construction commenced after the major source baseline date; and

(b) Actual emissions increases and decreases at any stationary source occurring after the minor source baseline date.

(14)(i) *Major source baseline date* means:

(a) In the case of particulate matter and sulfur dioxide, January 6, 1975, and

(b) In the case of nitrogen dioxide, February 8, 1988.

(ii) "Minor source baseline date" means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(a) In the case of particulate matter and sulfur dioxide, August 7, 1977, and

17

(*b*) In the case of nitrogen dioxide, February 8, 1988.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(*a*) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(i) (D) or (E) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21; and

(*b*) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM-10 increments, except that the Administrator shall rescind a minor source baseline date where it can be shown, to the satisfaction of the Administrator, that the emissions increase from the major stationary source, or net emissions increase from the major modification, responsible for triggering that date did not result in a significant amount of PM-10 emissions.

(15)(i) *Baseline area* means any intrastate area (and every part thereof) designated as attainment or unclassifiable under section 107(d)(1) (D) or (E) of the Act in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact equal to or greater than 1 μg/m³ (annual average) of the pollutant for which the minor source baseline date is established.

(ii) Area redesignations under section 107(d)(1) (D) or (E) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which:

(*a*) Establishes a minor source baseline date; or

(*b*) Is subject to 40 CFR 52.21 and would be constructed in the same state as the state proposing the redesignation.

(iii) Any baseline area established originally for the TSP increments shall

remain in effect and shall apply for purposes of determining the amount of available PM-10 increments, except that such baseline area shall not remain in effect if the Administrator rescinds the corresponding minor source baseline date in accordance with paragraph (b)(14)(iv) of this section.

(16) *Allowable emissions* means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(i) The applicable standards as set forth in 40 CFR parts 60 and 61;

(ii) The applicable State Implementation Plan emissions limitation, including those with a future compliance date; or

(iii) The emissions rate specified as a federally enforceable permit condition, including those with a future compliance date.

(17) *Federally enforceable* means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(18) *Secondary emissions* means emissions which would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. Secondary emissions include emissions from any off-site support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly

**Environmental Protection Agency**                                    **§ 52.21**

from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(i) Emissions from ships or trains coming to or from the new or modified stationary source; and

(ii) Emissions from any offsite support facility which would not otherwise be constructed or increase its emissions as a result of the construction or operation of the major stationary source or major modification.

(19) *Innovative control technology* means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) *Fugitive emissions* means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) *Actual emissions* means the actual rate of emissions of a pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21) (ii) through (iv) of this section.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit (other than an electric utility steam generating unit specified in paragraph (b)(21)(v) of this section) which has not begun normal operations on the particular date, actual emissions shall

equal the potential to emit of the unit on that date.

(v) For an electric utility steam generating unit (other than a new unit or the replacement of an existing unit) actual emissions of the unit following the physical or operational change shall equal the representative actual annual emissions of the unit, provided the source owner or operator maintains and submits to the Administrator on an annual basis for a period of 5 years from the date the unit resumes regular operation, information demonstrating that the physical or operational change did not result in an emissions increase. A longer period, not to exceed 10 years, may be required by the Administrator if he determines such a period to be more representative of normal source post-change operations.

(22) *Complete* means, in reference to an application for a permit, that the application contains all of the information necessary for processing the application.

(23)(i) *Significant* means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

*Pollutant and Emissions Rate*

Carbon monoxide: 100 tons per year (tpy)
Nitrogen oxides: 40 tpy
Sulfur dioxide: 40 tpy
Particulate matter:
   25 tpy of particulate matter emissions;
   15 tpy of $PM_{10}$ emissions
Ozone: 40 tpy of volatile organic compounds
Lead: 0.6 tpy
Asbestos: 0.007 tpy
Beryllium: 0.0004 tpy
Mercury: 0.1 tpy
Vinyl chloride: 1 tpy
Fluorides: 3 tpy
Sulfuric acid mist: 7 tpy
Hydrogen sulfide ($H_2$ S): 10 tpy
Total reduced sulfur (including $H_2$ S): 10 tpy
Reduced sulfur compounds (including $H_2$ S): 10 tpy
Municipal waste combustor organics (measured as total tetra- through octachlorinated dibenzo-p-dioxins and dibenzofurans): $3.2 \times 10^{-6}$ megagrams per year ($3.5 \times 10^{-6}$ tons per year). Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)
Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen

19

chloride): 36 megagrams per year (40 tons per year)

Municipal solid waste landfills emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) *Significant* means, in reference to a net emissions increase or the potential of a source to emit a pollutant subject to regulation under the Act that paragraph (b)(23)(i) of this section, does not list, any emissions rate.

(iii) Notwithstanding paragraph (b)(23)(i) of this section, *significant* means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 μg/m³, (24-hour average).

(24) *Federal Land Manager* means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) *High terrain* means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) *Low terrain* means any area other than high terrain.

(27) *Indian Reservation* means any federally recognized reservation established by Treaty, Agreement, executive order, or act of Congress.

(28) *Indian Governing Body* means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self government.

(29) *Adverse impact on visibility* means visibility impairment which interferes with the management, protection, preservation or enjoyment of the visitor's visual experience of the Federal Class I area. This determination must be made on a case-by-case basis taking into account the geographic extent, intensity, duration, frequency and time of visibility impairment, and how these factors correlate with (1) times of visitor use of the Federal Class I area, and (2) the frequency and timing of natural conditions that reduce visibility.

(30) *Volatile organic compounds (VOC)* is as defined in §51.100(s) of this chapter.

(31) *Electric utility steam generating unit* means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(32) *Pollution control project* means any activity or project undertaken at an existing electric utility steam generating unit for purposes of reducing emissions from such unit. Such activities or projects are limited to:

(i) The installation of conventional or innovative pollution control technology, including but not limited to advanced flue gas desulfurization, sorbent injection for sulfur dioxide and nitrogen oxides controls and electrostatic precipitators;

(ii) An activity or project to accommodate switching to a fuel which is less polluting than the fuel in use prior to the activity or project, including, but not limited to natural gas or coal re-burning, or the co-firing of natural gas and other fuels for the purpose of controlling emissions;

(iii) A permanent clean coal technology demonstration project conducted under title II, section 101(d) of the Further Continuing Appropriations Act of 1985 (sec. 5903(d) of title 42 of the United States Code), or subsequent appropriations, up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency; or

(iv) A permanent clean coal technology demonstration project that constitutes a repowering project.

(33) *Representative actual annual emissions* means the average rate, in tons per year, at which the source is projected to emit a pollutant for the two-year period after a physical change or change in the method of operation of a unit, (or a different consecutive two-year period within 10 years after that

**Environmental Protection Agency**                                        **§ 52.21**

change, where the Administrator determines that such period is more representative of normal source operations), considering the effect any such change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization. In projecting future emissions the Administrator shall:

(i) Consider all relevant information, including but not limited to, historical operational data, the company's own representations, filings with the State or Federal regulatory authorities, and compliance plans under title IV of the Clean Air Act; and

(ii) Exclude, in calculating any increase in emissions that results from the particular physical change or change in the method of operation at an electric utility steam generating unit, that portion of the unit's emissions following the change that could have been accommodated during the representative baseline period and is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change, including any increased utilization due to the rate of electricity demand growth for the utility system as a whole.

(34) *Clean coal technology* means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(35) *Clean coal technology demonstration project* means a project using funds appropriated under the heading "Department of Energy-Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(36) *Temporary clean coal technology demonstration project* means a clean

coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(37) (i) *Repowering* means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The Administrator shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(38) *Reactivation of a very clean coal-fired electric utility steam generating unit* means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than

21

85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-NO$_x$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(c) *Ambient air increments.* In areas designated as Class I, II or III, increases in pollutant concentration over the baseline concentration shall be limited to the following:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| **Class I** | |
| Particulate matter: | |
| PM–10, annual arithmetic mean .................. | 4 |
| PM–10, 24-hr maximum ............................ | 8 |
| Sulfur dioxide: | |
| Annual arithmetic mean ............................ | 2 |
| 24-hr maximum ...................................... | 5 |
| 3-hr maximum ........................................ | 25 |
| Nitrogen dioxide: | |
| Annual arithmetic mean ............................ | 2.5 |
| **Class II** | |
| Particulate matter: | |
| PM–10, annual arithmetic mean .................. | 17 |
| PM–10, 24-hr maximum ............................ | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean ............................ | 20 |
| 24-hr maximum ...................................... | 91 |
| 3-hr maximum ........................................ | 512 |
| Nitrogen dioxide: | |
| Annual arithmetic mean ............................ | 25 |
| **Class III** | |
| Particulate matter | |
| PM–10, annual arithmetic mean .................. | 34 |
| PM–10, 24-hr maximum ............................ | 60 |
| Sulfur dioxide: | |
| Annual arithmetic mean ............................ | 40 |
| 24-hr maximum ...................................... | 182 |
| 3-hr maximum ........................................ | 700 |
| Nitrogen dioxide: | |
| Annual arithmetic mean ............................ | 50 |

For any period other than an annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(d) *Ambient air ceilings.* No concentration of a pollutant shall exceed:

(1) The concentration permitted under the national secondary ambient air quality standard, or

(2) The concentration permitted under the national primary ambient air quality standard, whichever con-

centration is lowest for the pollutant for a period of exposure.

(e) *Restrictions on area classifications.* (1) All of the following areas which were in existence on August 7, 1977, shall be Class I areas and may not be redesignated:

(i) International parks,

(ii) National wilderness areas which exceed 5,000 acres in size,

(iii) National memorial parks which exceed 5,000 acres in size, and

(iv) National parks which exceed 6,000 acres in size.

(2) Areas which were redesignated as Class I under regulations promulgated before August 7, 1977, shall remain Class I, but may be redesignated as provided in this section.

(3) Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this section.

(4) The following areas may be redesignated only as Class I or II:

(i) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore; and

(ii) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

(f) [Reserved]

(g) *Redesignation.* (1) All areas (except as otherwise provided under paragraph (e) of this section) are designated Class II as of December 5, 1974. Redesignation (except as otherwise precluded by paragraph (e) of this section) may be proposed by the respective States or Indian Governing Bodies, as provided below, subject to approval by the Administrator as a revision to the applicable State implementation plan.

(2) The State may submit to the Administrator a proposal to redesignate areas of the State Class I or Class II provided that:

(i) At least one public hearing has been held in accordance with procedures established in § 51.102 of this chapter;

(ii) Other States, Indian Governing Bodies, and Federal Land Managers

22

**Environmental Protection Agency** §52.21

whose lands may be affected by the proposed redesignation were notified at least 30 days prior to the public hearing;

(iii) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social and energy effects of the proposed redesignation, was prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion;

(iv) Prior to the issuance of notice respecting the redesignation of an area that includes any Federal lands, the State has provided written notice to the appropriate Federal Land Manager and afforded adequate opportunity (not in excess of 60 days) to confer with the State respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any Federal Land Manager had submitted written comments and recommendations, the State shall have published a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the Federal Land Manager); and

(v) The State has proposed the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

(3) Any area other than an area to which paragraph (e) of this section refers may be redesignated as Class III if—

(i) The redesignation would meet the requirements of paragraph (g)(2) of this section;

(ii) The redesignation, except any established by an Indian Governing Body, has been specifically approved by the Governor of the State, after consultation with the appropriate committees of the legislature, if it is in session, or with the leadership of the legislature, if it is not in session (unless State law provides that the redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area to be redesignated enact legislation or pass resolutions concurring in the redesignation:

(iii) The redesignation would not cause, or contribute to, a concentration of any air pollutant which would exceed any maximum allowable increase permitted under the classification of any other area or any national ambient air quality standard; and

(iv) Any permit application for any major stationary source or major modification, subject to review under paragraph (l) of this section, which could receive a permit under this section only if the area in question were redesignated as Class III, and any material submitted as part of that application, were available insofar as was practicable for public inspection prior to any public hearing on redesignation of the area as Class III.

(4) Lands within the exterior boundaries of Indian Reservations may be redesignated only by the appropriate Indian Governing Body. The appropriate Indian Governing Body may submit to the Administrator a proposal to redesignate areas Class I, Class II, or Class III: *Provided,* That:

(i) The Indian Governing Body has followed procedures equivalent to those required of a State under paragraphs (g)(2), (g)(3)(iii), and (g)(3)(iv) of this section; and

(ii) Such redesignation is proposed after consultation with the State(s) in which the Indian Reservation is located and which border the Indian Reservation.

(5) The Administrator shall disapprove, within 90 days of submission, a proposed redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this paragraph or is inconsistent with paragraph (e) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

(6) If the Administrator disapproves any proposed redesignation, the State or Indian Governing Body, as appropriate, may resubmit the proposal after

23

correcting the deficiencies noted by the Administrator.

(h) *Stack heights.* (1) The degree of emission limitation required for control of any air pollutant under this section shall not be affected in any manner by—

(i) So much of the stack height of any source as exceeds good engineering practice, or

(ii) Any other dispersion technique.

(2) Paragraph (h)(1) of this section shall not apply with respect to stack heights in existence before December 31, 1970, or to dispersion techniques implemented before then.

(i) *Review of major stationary sources and major modifications—Source applicability and exemptions.* (1) No stationary source or modification to which the requirements of paragraphs (j) through (r) of this section apply shall begin actual construction without a permit which states that the stationary source or modification would meet those requirements. The Administrator has authority to issue any such permit.

(2) The requirements of paragraphs (j) through (r) of this section shall apply to any major stationary source and any major modification with respect to each pollutant subject to regulation under the Act that it would emit, except as this section otherwise provides.

(3) The requirements of paragraphs (j) through (r) of this section apply only to any major stationary source or major modification that would be constructed in an area designated as attainment or unclassifiable under section 107(d)(1)(D) or (E) of the Act.

(4) The requirements of paragraphs (j) through (r) of this section shall not apply to a particular major stationary source or major modification, if;

(i) Construction commenced on the source or modification before August 7, 1977. The regulations at 40 CFR 52.21 as in effect before August 7, 1977, shall govern the review and permitting of any such source or modification; or

(ii) The source or modification was subject to the review requirements of 40 CFR 52.21(d)(1) as in effect before March 1, 1978, and the owner or operator:

(a) Obtained under 40 CFR 52.21 a final approval effective before March 1, 1978;

(b) Commenced construction before March 19, 1979; and

(c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable time; or

(iii) The source or modification was subject to 40 CFR 52.21 as in effect before March 1, 1978, and the review of an application for approval for the stationary source or modification under 40 CFR 52.21 would have been completed by March 1, 1978, but for an extension of the public comment period pursuant to a request for such an extension. In such a case, the application shall continue to be processed, and granted or denied, under 40 CFR 52.21 as in effect prior to March 1, 1978; or

(iv) The source or modification was not subject to 40 CFR 52.21 as in effect before March 1, 1978, and the owner or operator:

(a) Obtained all final Federal, state and local preconstruction approvals or permits necessary under the applicable State Implementation Plan before March 1, 1978;

(b) Commenced construction before March 19, 1979; and

(c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable time; or

(v) The source or modification was not subject to 40 CFR 52.21 as in effect on June 19, 1978 or under the partial stay of regulations published on February 5, 1980 (45 FR 7800), and the owner or operator:

(a) Obtained all final Federal, state and local preconstruction approvals or permits necessary under the applicable State Implementation Plan before August 7, 1980;

(b) Commenced construction within 18 months from August 7, 1980, or any earlier time required under the applicable State Implementation Plan; and

(c) Did not discontinuue construction for a period of 18 months or more and completed construction within a reasonable time; or

**Environmental Protection Agency**                           **§52.21**

(vi) The source or modification would be a nonprofit health or nonprofit educational institution, or a major modification would occur at such an institution, and the governor of the state in which the source or modification would be located requests that it be exempt from those requirements; or

(vii) The source or modification would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

*(a)* Coal cleaning plants (with thermal dryers);

*(b)* Kraft pulp mills;

*(c)* Portland cement plants;

*(d)* Primary zinc smelters;

*(e)* Iron and steel mills;

*(f)* Primary aluminum ore reduction plants;

*(g)* Primary copper smelters;

*(h)* Municipal incinerators capable of charging more than 250 tons of refuse per day;

*(i)* Hydrofluoric, sulfuric, or nitric acid plants;

*(j)* Petroleum refineries;

*(k)* Lime plants;

*(l)* Phosphate rock processing plants;

*(m)* Coke oven batteries;

*(n)* Sulfur recovery plants;

*(o)* Carbon black plants (furnace process);

*(p)* Primary lead smelters;

*(q)* Fuel conversion plants;

*(r)* Sintering plants;

*(s)* Secondary metal production plants;

*(t)* Chemical process plants;

*(u)* Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

*(v)* Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

*(w)* Taconite ore processing plants;

*(x)* Glass fiber processing plants;

*(y)* Charcoal production plants;

*(z)* Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

*(aa)* Any other stationary source category which, as of August 7, 1980, is

being regulated under section 111 or 112 of the Act; or

(viii) The source is a portable stationary source which has previously received a permit under this section, and

*(a)* The owner or operator proposes to relocate the source and emissions of the source at the new location would be temporary; and

*(b)* The emissions from the source would not exceed its allowable emissions; and

*(c)* The emissions from the source would impact no Class I area and no area where an applicable increment is known to be violated; and

*(d)* Reasonable notice is given to the Administrator prior to the relocation identifying the proposed new location and the probable duration of operation at the new location. Such notice shall be given to the Administrator not less than 10 days in advance of the proposed relocation unless a different time duration is previously approved by the Administrator.

(ix) The source or modification was not subject to §52.21, with respect to particulate matter, as in effect before July 31, 1987, and the owner or operator:

*(a)* Obtained all final Federal, State, and local preconstruction approvals or permits necessary under the applicable State implementation plan before July 31, 1987;

*(b)* Commenced construction within 18 months after July 31, 1987, or any earlier time required under the State implementation plan; and

*(c)* Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable period of time.

(x) The source or modification was subject to 40 CFR 52.21, with respect to particulate matter, as in effect before July 31, 1987 and the owner or operator submitted an application for a permit under this section before that date, and the Administrator subsequently determines that the application as submitted was complete with respect to the particular matter requirements then in effect in the section. Instead, the requirments of paragraphs (j) through (r) of this section that were in effect before July 31, 1987 shall apply to such source or modifiction.

25

(5) The requirements of paragraphs (j) through (r) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in an area designated as nonattainment under section 107 of the Act.

(6) The requirements of paragraphs (k), (m) and (o) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant, if the allowable emissions of that pollutant from the source, or the net emissions increase of that pollutant from the modification:

(i) Would impact no Class I area and no area where an applicable increment is known to be violated, and

(ii) Would be temporary.

(7) The requirements of paragraphs (k), (m) and (o) of this section as they relate to any maximum allowable increase for a Class II area shall not apply to a major modification at a stationary source that was in existence on March 1, 1978, if the net increase in allowable emissions of each pollutant subject to regulation under the Act from the modification after the application of best available control technology would be less than 50 tons per year.

(8) The Administrator may exempt a stationary source or modification from the requirements of paragraph (m) of this section, with respect to monitoring for a particular pollutant if:

(i) The emissions increase of the pollutant from the new source or the net emissions increase of the pollutant from the modification would cause, in any area, air quality impacts less than the following amounts:

Carbon monoxide—575 µg/m³, 8-hour average;
Nitrogen dioxide—14 µg/m³, annual average;
Particulate matter—10 µg/m³ of PM–10, 24-hour average;
Sulfur dioxide—13 µg/m³, 24-hour average;
Ozone; [1]

Lead—0.1 µg/m³, 3-month average;
Mercury—0.25 µg/m³, 24-hour average;
Beryllium—0.001 µg/m³, 24-hour average;
Fluorides—0.25 µg/m³, 24-hour average;
Vinyl chloride—15 µg/m³, 24-hour average;
Total reduced sulfur—10 µg/m³, 1-hour average;
Hydrogen sulfide—0.2 µg/m³, 1-hour average;
Reduced sulfur compounds—10 µg/m³, 1-hour average; or

(ii) The concentrations of the pollutant in the area that the source or modification would affect are less than the concentrations listed in paragraph (i)(8)(i) of this section, or the pollutant is not listed in paragraph (i)(8)(i) of this section.

(9) The requirements for best available control technology in paragraph (j) of this section and the requirements for air quality analyses in paragraph (m)(1) of this section, shall not apply to a particular stationary source or modification that was subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submitted an application for a permit under those regulations before August 7, 1980, and the Administrator subsequently determines that the application as submitted before that date was complete. Instead, the requirements at 40 CFR 52.21(j) and (n) as in effect on June 19, 1978 apply to any such source or modification.

(10)(i) The requirements for air quality monitoring in paragraphs (m)(1) (ii) through (iv) of this section shall not apply to a particular source or modification that was subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submits an application for a permit under this section on or before June 8, 1981, and the Administrator subsequently determines that the application as submitted before that date was complete with respect to the requirements of this section other than those in paragraphs (m)(1) (ii) through (iv) of this section, and with respect to the requirements for such analyses at 40 CFR 52.21(m)(2) as in effect on June 19, 1978. Instead, the latter requirements shall apply to any such source or modification.

(ii) The requirements for air quality monitoring in paragraphs (m)(1) (ii) through (iv) of this section shall not

---

[1] No *de minimis* air quality level is provided for ozone. However, any net increase of 100 tons per year or more of volatile organic compounds subject to PSD would be required to perform an ambient impact analysis including the gathering of ambient air quality data.

**Environmental Protection Agency**§ 52.21

apply to a particular source or modification that was not subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submits an application for a permit under this section on or before June 8, 1981, and the Administrator subsequently determines that the application as submitted before that date was complete, except with respect to the requirements in paragraphs (m)(1) (ii) through (iv).

(11)(i) At the discretion of the Administrator, the requirements for air quality monitoring in paragraphs $PM_{10}$ (m)(1) (i)—(iv) of this section may not apply to a particular source or modification when the owner or operator of the source or modification submits an application for a permit under this section on or before June 1, 1988 and the Administrator subsequently determines that the application as submitted before that date was complete, except with respect to the requirements for monitoring particulate matter in paragraphs (m)(1) (i)—(iv).

(ii) The requirements for air quality monitoring pf $PM_{10}$ in paragraphs (m)(1), (ii) and (iv) and (m)(3) of this section shall apply to a particular source or modification if the owner or operator of the source or modification submits an application for a permit under this section after June 1, 1988 and no later than December 1, 1988. The data shall have been gathered over at least the period from February 1, 1988 to the date the application becomes otherwise complete in accordance with the provisions set forth under paragraph (m)(1)(viii) of this section, except that if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data over a shorter period (not to be less than 4 months), the data that paragraph (m)(1)(iii) requires shall have been gathered over a shorter period.

(12) The requirements of paragraph (k)(2) of this section shall not apply to a stationary source or modification with respect to any maximum allowable increase for nitrogen oxides if the owner or operator of the source or modification submitted an application for a permit under this section before the provisions embodying the maximum allowable increase took effect as

part of the applicable implementation plan and the Administrator subsequently determined that the application as submitted before that date was complete.

(13) The requirements in paragraph (k)(2) of this section shall not apply to a stationary source or modification with respect to any maximum allowable increase for PM–10 if (i) the owner or operator of the source or modification submitted an application for a permit under this section before the provisions embodying the maximum allowable increases for PM–10 took effect in an implementation plan to which this section applies, and (ii) the Administrator subsequently determined that the application as submitted before that date was otherwise complete. Instead, the requirements in paragraph (k)(2) shall apply with respect to the maximum allowable increases for TSP as in effect on the date the application was submitted.

(j) *Control technology review.* (1) A major stationary source or major modification shall meet each applicable emissions limitation under the State Implementation Plan and each applicable emissions standard and standard of performance under 40 CFR parts 60 and 61.

(2) A new major stationary source shall apply best available control technology for each pollutant subject to regulation under the Act that it would have the potential to emit in significant amounts.

(3) A major modification shall apply best available control technology for each pollutant subject to regulation under the Act for which it would result in a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.

(4) For phased construction projects, the determination of best available control technology shall be reviewed and modified as appropriate at the latest reasonable time which occurs no later than 18 months prior to commencement of construction of each independent phase of the project. At such time, the owner or operator of the

27

applicable stationary source may be required to demonstrate the adequacy of any previous determination of best available control technology for the source.

(k) *Source impact analysis.* The owner or operator of the proposed source or modification shall demonstrate that allowable emission increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reductions (including secondary emissions), would not cause or contribute to air pollution in violation of:

(1) Any national ambient air quality standard in any air quality control region; or

(2) Any applicable maximum allowable increase over the baseline concentration in any area.

(l) *Air quality models.* (1) All estimates of ambient concentrations required under this paragraph shall be based on applicable air quality models, data bases, and other requirements specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models).

(2) Where an air quality model specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models) is inappropriate, the model may be modified or another model substituted. Such a modification or substitution of a model may be made on a case-by-case basis or, where appropriate, on a generic basis for a specific state program. Written approval of the Administrator must be obtained for any modification or substitution. In addition, use of a modified or substituted model must be subject to notice and opportunity for public comment under procedures developed in accordance with paragraph (q) of this section.

(m) *Air quality analysis—*(1) *Preapplication analysis.* (i) Any application for a permit under this section shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following pollutants:

(*a*) For the source, each pollutant that it would have the potential to omit in a significant amount;

(*b*) For the modification, each pollutant for which it would result in a significant net emissions increase.

(ii) With respect to any such pollutant for which no National Ambient Air Quality Standard exists, the analysis shall contain such air quality monitoring data as the Administrator determines is necessary to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.

(iii) With respect to any such pollutant (other than nonmethane hydrocarbons) for which such a standard does exist, the analysis shall contain continuous air quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the standard or any maximum allowable increase.

(iv) In general, the continuous air quality monitoring data that is required shall have been gathered over a period of at least one year and shall represent at least the year preceding receipt of the application, except that, if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data gathered over a period shorter than one year (but not to be less than four months), the data that is required shall have been gathered over at least that shorter period.

(v) For any application which becomes complete, except as to the requirements of paragraphs (m)(1) (iii) and (iv) of this section, between June 8, 1981, and February 9, 1982, the data that paragraph (m)(1)(iii) of this section, requires shall have been gathered over at least the period from February 9, 1981, to the date the application becomes otherwise complete, except that:

(*a*) If the source or modification would have been major for that pollutant under 40 CFR 52.21 as in effect on June 19, 1978, any monitoring data shall have been gathered over at least the period required by those regulations.

(*b*) If the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data over a shorter period (not to be less than four months), the data that paragraph (m)(1)(iii) of this section, requires shall have been gathered over at least that shorter period.

**Environmental Protection Agency** §52.21

(*c*) If the monitoring data would relate exclusively to ozone and would not have been required under 40 CFR 52.21 as in effect on June 19, 1978, the Administrator may waive the otherwise applicable requirements of this paragraph (v) to the extent that the applicant shows that the monitoring data would be unrepresentative of air quality over a full year.

(vi) The owner or operator of a proposed stationary source or modification of violatile organic compounds who satisfies all conditions of 40 CFR part 51 Appendix S, section IV may provide post-approval monitoring data for ozone in lieu of providing preconstruction data as requried under paragraph (m)(1) of this section.

(vii) For any application that becomes complete, except as to the requirements of paragraphs (m)(1) (iii) and (iv) pertaining to $PM_{10}$, after December 1, 1988 and no later than August 1, 1989 the data that paragraph (m)(1)(iii) requires shall have been gathered over at least the period from August 1, 1988 to the date the application becomes otherwise complete, except that if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data over a shorter period (not to be less than 4 months), the data that paragraph (m)(1)(iii) requires shall have been gathered over that shorter period.

(viii) With respect to any requirements for air quality monitoring of $PM_{10}$ under paragraphs (i)(11) (i) and (ii) of this section the owner or operator of the source or modification shall use a monitoring method approved by the Administratorand shall estimate the ambient concentrations of $PM_{10}$ using the data collected by such approved monitoring method in accordance with estimating procedures approved by the Administrator.

(2) Post-construction monitoring. The owner or operator of a major stationary source or major modification shall, after construction of the stationary source or modification, conduct such ambient monitoring as the Administrator determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

(3) Operations of monitoring stations. The owner or operator of a major stationary source or major modification shall meet the requirements of Appendix B to part 58 of this chapter during the operation of monitoring stations for purposes of satisfying paragraph (m) of this section.

(n) *Source information.* The owner or operator of a proposed source or modification shall submit all information necessary to perform any analysis or make any determination required under this section.

(1) With respect to a source or modification to which paragraphs (j), (l), (n) and (p) of this section apply, such information shall include:

(i) A description of the nature, location, design capacity, and typical operating schedule of the source or modification, including specifications and drawings showing its design and plant layout;

(ii) A detailed schedule for construction of the source or modification;

(iii) A detailed description as to what system of continuous emission reduction is planned for the source or modification, emission estimates, and any other information necessary to determine that best available control technology would be applied.

(2) Upon request of the Administrator, the owner or operator shall also provide information on:

(i) The air quality impact of the source or modification, including meteorological and topographical data necessary to estimate such impact; and

(ii) The air quality impacts, and the nature and extent of any or all general commercial, residential, industrial, and other growth which has occurred since August 7, 1977, in the area the source or modification would affect.

(o) *Additional impact analyses.* (1) The owner or operator shall provide an analysis of the impairment to visibility, soils and vegetation that would occur as a result of the source or modification and general commercial, residential, industrial and other growth associated with the source or modification. The owner or operator need not provide an analysis of the impact on

29

vegetation having no significant commercial or recreational value.

(2) The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general commercial, residential, industrial and other growth associated with the source or modification.

(3) *Visibility monitoring.* The Administrator may require monitoring of visibility in any Federal class I area near the proposed new stationary source for major modification for such purposes and by such means as the Administrator deems necessary and appropriate.

(p) *Sources impacting Federal Class I areas—additional requirements*—(1) *Notice to Federal land managers.* The Administrator shall provide written notice of any permit application for a proposed major stationary source or major modification, the emissions from which may affect a Class I area, to the Federal land manager and the Federal official charged with direct responsibility for management of any lands within any such area. Such notification shall include a copy of all information relevant to the permit application and shall be given within 30 days of receipt and at least 60 days prior to any public hearing on the application for a permit to construct. Such notification shall include an analysis of the proposed source's anticipated impacts on visibility in the Federal Class I area. The Administrator shall also provide the Federal land manager and such Federal officials with a copy of the preliminary determination required under paragraph (q) of this section, and shall make available to them any materials used in making that determination, promptly after the Administrator makes such determination. Finally, the Administrator shall also notify all affected Federal land managers within 30 days of receipt of any advance notification of any such permit application.

(2) *Federal Land Manager.* The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands have an affirmative responsibility to protect the air quality related values (including visibility) of such lands and to consider, in consultation with the Administrator, whether a proposed source or modification will have an adverse impact on such values.

(3) *Visibility analysis.* The Administrator shall consider any analysis performed by the Federal land manager, provided within 30 days of the notification required by paragraph (p)(1) of this section, that shows that a proposed new major stationary source or major modification may have an adverse impact on visibility in any Federal Class I area. Where the Administrator finds that such an analysis does not demonstrate to the satisfaction of the Administrator that an adverse impact on visibility will result in the Federal Class I area, the Administrator must, in the notice of public hearing on the permit application, either explain his decision or give notice as to where the explanation can be obtained.

(4) *Denial—impact on air quality related values.* The Federal Land Manager of any such lands may demonstrate to the Administrator that the emissions from a proposed source or modification would have an adverse impact on the air quality-related values (including visibility) of those lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Administrator concurs with such demonstration, then he shall not issue the permit.

(5) *Class I variances.* The owner or operator of a proposed source or modification may demonstrate to the Federal Land Manager that the emissions from such source or modification would have no adverse impact on the air quality related values of any such lands (including visibility), notwithstanding that the change in air quality resulting from emissions from such source or modification would cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Federal land manager concurs with such demonstration and he so certifies, the State may authorize the Administrator: *Provided,* That the applicable requirements of this section are otherwise met, to issue

**Environmental Protection Agency** §52.21

the permit with such emission limitations as may be necessary to assure that emissions of sulfur dioxide, particulate matter, and nitrogen oxides would not exceed the following maximum allowable increases over minor source baseline concentration for such pollutants:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
|   PM–10, annual arithmetic mean ............... | 17 |
|   PM–10, 24-hr maximum ............................ | 30 |
| Sulfur dioxide: | |
|   Annual arithmetic mean ............................ | 20 |
|   24-hr maximum ........................................... | 91 |
|   3-hr maximum ............................................. | 325 |
| Nitrogen dioxide: | |
|   Annual arithmetic mean ............................ | 25 |

(6) *Sulfur dioxide variance by Governor with Federal Land Manager's concurrence.* The owner or operator of a proposed source or modification which cannot be approved under paragraph (q)(4) of this section may demonstrate to the Governor that the source cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for a period of twenty-four hours or less applicable to any Class I area and, in the case of Federal mandatory Class I areas, that a variance under this clause would not adversely affect the air quality related values of the area (including visibility). The Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may, after notice and public hearing, grant a variance from such maximum allowable increase. If such variance is granted, the Administrator shall issue a permit to such source or modification pursuant to the requirements of paragraph (q)(7) of this section: *Provided,* That the applicable requirements of this section are otherwise met.

(7) *Variance by the Governor with the President's concurrence.* In any case where the Governor recommends a variance in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that the vari-

ance is in the national interest. If the variance is approved, the Administrator shall issue a permit pursuant to the requirements of paragraph (q)(7) of this section: *Provided,* That the applicable requirements of this section are otherwise met.

(8) *Emission limitations for Presidential or gubernatorial variance.* In the case of a permit issued pursuant to paragraph (q) (5) or (6) of this section the source or modification shall comply with such emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period:

MAXIMUM ALLOWABLE INCREASE
[Micrograms per cubic meter]

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hr maximum ....................................... | 36 | 62 |
| 3-hr maximum ......................................... | 130 | 221 |

(q) *Public participation.* The Administrator shall follow the applicable procedures of 40 CFR part 124 in processing applications under this section. The Administrator shall follow the procedures at 40 CFR 52.21(r) as in effect on June 19, 1979, to the extent that the procedures of 40 CFR part 124 do not apply.

(r) *Source obligation.* (1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations

without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

(2) Approval to construct shall become invalid if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18-month period upon a satisfactory showing that an extension is justified. This provision does not apply to the time period between construction of the approved phases of a phased construction project; each phase must commence construction within 18 months of the projected and approved commencement date.

(3) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the State implementation plan and any other requirements under local, State, or Federal law.

(4) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements or paragraphs (j) through (s) of this section shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(s) *Environmental impact statements.* Whenever any proposed source or modification is subject to action by a Federal Agency which might necessitate preparation of an environmental impact statement pursuant to the National Environmental Policy Act (42 U.S.C. 4321), review by the Administrator conducted pursuant to this section shall be coordinated with the broad environmental reviews under that Act and under section 309 of the Clean Air Act to the maximum extent feasible and reasonable.

(t) *Disputed permits or redesignations.* If any State affected by the redesignation of an area by an Indian Governing Body, or any Indian Governing Body of a tribe affected by the redesignation of an area by a State, disagrees with such redesignation, or if a permit is proposed to be issued for any major stationary source or major modification proposed for construction in any State which the Governor of an affected State or Indian Governing Body of an affected tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or Indian Reservation, the Governor or Indian Governing Body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian Governing Body involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable State implementation plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(u) *Delegation of authority.* (1) The Administrator shall have the authority to delegate his responsibility for conducting source review pursuant to this section, in accordance with paragraphs (v) (2) and (3) of this section.

(2) Where the Administrator delegates the responsibility for conducting source review under this section to any agency other than a Regional Office of the Environmental Protection Agency, the following provisions shall apply:

(i) Where the delegate agency is not an air pollution control agency, it shall consult with the appropriate State and local air pollution control agency prior to making any determination under this section. Similarly, where the delegate agency does not have continuing responsibility for managing land use, it shall consult with the appropriate

**Environmental Protection Agency** §52.21

State and local agency primarily responsible for managing land use prior to making any determination under this section.

(ii) The delegate agency shall send a copy of any public comment notice required under paragraph (r) of this section to the Administrator through the appropriate Regional Office.

(3) The Administrator's authority for reviewing a source or modification located on an Indian Reservation shall not be redelegated other than to a Regional Office of the Environmental Protection Agency, except where the State has assumed jurisdiction over such land under other laws. Where the State has assumed such jurisdiction, the Administrator may delegate his authority to the States in accordance with paragraph (v)(2) of this section.

(4) In the case of a source or modification which proposes to construct in a class III area, emissions from which would cause or contribute to air quality exceeding the maximum allowable increase applicable if the area were designated a class II area, and where no standard under section 111 of the act has been promulgated for such source category, the Administrator must approve the determination of best available control technology as set forth in the permit.

(v) *Innovative control technology.* (1) An owner or operator of a proposed major stationary source or major modification may request the Administrator in writing no later than the close of the comment period under 40 CFR 124.10 to approve a system of innovative control technology.

(2) The Administrator shall, with the consent of the governor(s) of the affected state(s), determine that the source or modification may employ a system of innovative control technology, if: —

(i) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function;

(ii) The owner or operator agrees to achieve a level of continuous emissions reduction equivalent to that which would have been required under paragraph (j)(2) of this section, by a date specified by the Administrator. Such date shall not be later than 4 years from the time of startup or 7 years from permit issuance;

(iii) The source or modification would meet the requirements of paragraphs (j) and (k) of this section, based on the emissions rate that the stationary source employing the system of innovative control technology would be required to meet on the date specified by the Administrator;

(iv) The source or modification would not before the date specified by the Administrator:

(*a*) Cause or contribute to a violation of an applicable national ambient air quality standard; or

(*b*) Impact any area where an applicable increment is known to be violated; and

(v) All other applicable requirements including those for public participation have been met.

(vi) The provisions of paragraph (p) of this section (relating to Class I areas) have been satisfied with respect to all periods during the life of the source or modification.

(3) The Administrator shall withdraw any approval to employ a system of innovative control technology made under this section, if:

(i) The proposed system fails by the specified date to achieve the required continuous emissions reduction rate; or

(ii) The proposed system fails before the specified date so as to contribute to an unreasonable risk to public health, welfare, or safety; or

(iii) The Administrator decides at any time that the proposed system is unlikely to achieve the required level of control or to protect the public health, welfare, or safety.

(4) If a source or modification fails to meet the required level of continuous emission reduction within the specified time period or the approval is withdrawn in accordance with paragraph (v)(3) of this section, the Administrator may allow the source or modification up to an additional 3 years to meet the requirement for the application of best available control technology through use of a demonstrated system of control.

(w) *Permit rescission.* (1) Any permit issued under this section or a prior

33

version of this section shall remain in effect, unless and until it expires under paragraph (s) of this section or is rescinded.

(2) Any owner or operator of a stationary source or modification who holds a permit for the source or modification which was issued under 40 CFR 52.21 as in effect on July 30, 1987, or any earlier version of this section, may request that the Administrator rescind the permit or a particular portion of the permit.

(3) The Administrator shall grant an application for rescission if the application shows that this section would not apply to the source or modification.

(4) If the Administrator rescinds a permit under this paragraph, the public shall be given adequate notice of the rescission. Publication of an announcement of rescission in a newspaper of general circulation in the affected region within 60 days of the rescission shall be considered adequate notice.

[43 FR 26403, June 19, 1978]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 52.21, see the List of CFR Sections Affected in the Finding Aids section of this volume.

### § 52.23   Violation and enforcement.

Failure to comply with any provisions of this part, or with any approved regulatory provision of a State implementation plan, or with any permit condition or permit denial issued pursuant to approved or promulgated regulations for the review of new or modified stationary or indirect sources, or with any permit limitation or condition contained within an operating permit issued under an EPA-approved program that is incorporated into the State implementation plan, shall render the person or governmental entity so failing to comply in violation of a requirement of an applicable implementation plan and subject to enforcement action under section 113 of the Clean Air Act. With regard to compliance schedules, a person or Governmental entity will be considered to have failed to comply with the requirements of this part if it fails to timely submit any required compliance schedule, if the compliance schedule when submitted does not contain each of the elements it is required to contain, or if the person or Governmental entity fails to comply with such schedule.

[39 FR 33512, Sept. 18, 1974, as amended at 54 FR 27285, June 28, 1989]

### § 52.24   Statutory restriction on new sources.

(a) After June 30, 1979, no major stationary source shall be constructed or modified in any nonattainment area as designated in 40 CFR part 81, subpart C (''nonattainment area'') to which any State implementation plan applies, if the emissions from suy will cause or contribute to concentrations of any pollutant for which a national ambient air quality standard is exceeded in such area, unless, as of the time of application for a permit for such construction, such plan meets the requirements of Part D, Title I, of the Clean Air Act, as amended (42 U.S.C. 7501 *et seq.*) (''Part D''). This section shall not apply to any nonattainment area once EPA has fully approved the State implementation plan for the area as meeting the requirements of Part D.

(b) For any nonattainment area for which the SIP satisfies the requirements of Part D, permits to construct and operate new or modified major stationary sources may be issued only if the applicable SIP is being carried out for the nonattainment area in which the proposed source is to be constructed or modified in accordance with the requirements of Part D.

(c) The Emission Offset Interpretative Ruling, 40 CFR part 51, Appendix S (''Offset Ruling''), rather than paragraphs (a) and (b), governs permits to construct and operate applied for before the deadline for having a revised SIP in effect that satisfies Part D. This deadline is July 1, 1979, for areas designated as nonattainment on March 3, 1978 (42 FR 8962). The revised SIP, rather than paragraph (a) of this section, governs permits applied for during a period when the revised SIP is in compliance with Part D.

(d) The restrictions in paragraphs (a) and (b) apply only to major stationary sources of emissions that cause or contribute to concentrations of the pollutant for which the nonattainment area was designated as nonattainment, and