# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

UNITED STATES OF AMERICA )
and the STATE OF ILLINOIS, )    Judge John W. Darrah
 )    Magistrate Judge Maria Valdez
    Plaintiffs, )
 )
    v. )    Civil Action No. 09-cv-05277
 )
MIDWEST GENERATION, LLC, )
 )
    Defendant. )
_____)

# PLAINTIFFS' OPPOSITION
# TO DEFENDANT'S PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     The PSD Program Imposes Continuing Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    The Statutory and Regulatory Language Demonstrates That PSD
              Imposes Continuing Obligations On The Source  . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Emissions Limits Imposed Under the PSD Program Are Enforceable
              On A Continuing Basis Under Section 113 of the CAA . . . . . . . . . . . . . . . . . . . 7

        C.    The Case Law Supports Plaintiffs' Interpretation That a Violation
              Of PSD Requirements Constitutes an Ongoing Violation of the CAA . . . . . . . . . 9

III.    Penalties Are Appropriate If PSD Violations Are Deemed Continuing  . . . . . . . . . . . . 12

IV.     Injunctive Relief Is Appropriate Whether Or Not the Violations Are Continuing  . . . . . 14

        A.    The Court Has Authority To Order Injunctive Relief . . . . . . . . . . . . . . . . . . . . . 14

        B.    Injunctive Relief Is Appropriate Here In Order To Require Installation and
              Operation of Pollution Controls That Would Have Been Required In a
              PSD Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ala. Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 15

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394 (6th Cir. 1999) . . . . . . . . . . . . . 13

*Auer v. Robbins*, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Badaracco v. Comm'r*, 464 U.S. 386 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) . . . . . . . . . . . . . 6

*CleanCOALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Corley v. United States*, 129 S. Ct. 1558 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

*E.I. Dupont Nemours & Co. v. Davis*, 264 U.S. 456 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Erickson v. Pardus*, 551 U.S. 89 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Harmon Indus., Inc. v. Browner*, 19 F. Supp. 2d 988 (W.D. Mo. 1998) . . . . . . . . . . . . . . . . . . 12

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Interamericas Invs., Ltd. v. Board of Governors of Fed. Reserve Sys.*, 11 F.3d 376
       (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Marbury v. Madison*, 1 Cranch 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mullikin v. United States*, 952 F.2d 920 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410
       (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 9, 10

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316
(11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003) . . . . . 10, 16

*Newell Recycling Co. v. U.S. EPA*, 231 F.3d 204 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 11-12

*Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303 (3rd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 18

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1561 (N.D. Ga. 1994) . . . . . . . . . . . . . . . . . . . . . 13

*Sierra Club v. Franklin County Power*, 546 F.3d 918 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . 9-10

*Sierra Club v. Ga. Power Co.*, 443 F.3d 1346 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sierra Club v. Otter Tail Corp.*, 608 F. Supp. 2d 1120 (D. S.D. 2009) . . . . . . . . . . . . . . . . . . . . 10

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Town of Munster, Indiana v. Sherwin-Williams Co., Inc.*, 27 F.3d 1268 (7th Cir. 1994) . . . 15-16

*U.S. Bank Nat'l Ass'n. v. U.S. EPA*, 563 F.3d 199 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp. 2d 808 (S.D. Ohio 2001) . . . . . . 8, 9

*United States v. Banks*, 115 F.3d 916 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025 (S.D. Ind. 2005) . . . . . . . . . . . . 10, 14, 16

*United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055 (S.D. Ind. 2008) . . . . . . . . . . . . 14-15, 16

*United States v. Cinergy Corp.*, 618 F. Supp. 2d 942 (S.D. Ind. 2009) . . . . . . . . . . . . . . . . . . . 8

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) . . . . 3, 7, 8-9, 13-14

*United States v. E. Ky. Power Coop.*, 498 F. Supp. 2d 970 (E.D. Ky. 2007) . . . . . . . . . . . . . . . 9

*United States v. Greene-Thapedi*, 398 F.3d 635 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Illinois Power Co.*, 245 F. Supp. 2d 951 (S.D. Ill. 2003) . . . . . . . . . . . . . 14, 16

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

*United States v. La.-Pac. Corp.*, 682 F. Supp. 1122 (D. Colo. 1987) . . . . . . . . . . . . . . . . . . . . . 10

*United States v. La.-Pac. Corp.*, 682 F. Supp. 1141 (D. Colo. 1988) . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . . . . 5, 9, 10

*United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054 (W.D. Wis. 2001) . . . . . 10, 14, 16

*United States v. Telluride Co.*, 146 F.3d 1241 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Westvaco Corp.*, 144 F. Supp. 2d 439 (D. Md. 2001) . . . . . . . . . . . . . . . . . . . 10

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 6-7, 11

## UNREPORTED FEDERAL CASES

*New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*, No. 07-CV-5298, 2009 WL
    3234438 (E.D. Pa. Sept. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 16, 18

*Or. Envtl. Council et al. v. Or. Dep't of Envtl Quality et al.*, No. 91-13-FR, 1992 WL
    252123 (D. Or. Sept. 24, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sierra Club v. Dayton Power & Light, Inc.*, No. 2:04 CV905, 2005 WL 1972549
    (S.D. Ohio Aug. 12, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sierra Club v. Portland Gen. Elec. Co.*, No. 08-1136-HA, 2009 WL 3245917
    (D. Or. Sept. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 9

*United States Dist. Court v. Campbell Soup Co.*, No. CIV-S95-1854, 1997 WL 258894
    (E.D. Cal. Mar. 11, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Ohio Edison Co.*, No. 2:99-CV-1181, 2003 WL 23415140 (S.D. Ohio
    Jan. 17, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*United States v. S. Ind. Gas & Elec. Co.*, No. IP 99-1692-C-M/F, 2002 WL
    1760752 (S.D. Ind. July 26, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## FEDERAL STATUTES AND REGULATIONS

28 U.S.C. § 2462 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 7410 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 7413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

42 U.S.C. § 7413(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11, 15, 16

42 U.S.C. § 7413(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

42 U.S.C. § 7413(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7413(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 7475(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

42 U.S.C. § 7475 (a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7477 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

42 U.S.C. § 7479(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 7479(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 7602(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 7661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8


40 C.F.R. § 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

40 C.F.R. § 52.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 52.21(b)(21)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

40 C.F.R. § 52.21(j)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 52.21(j)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

40 C.F.R. § 52.21(m)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 52.21(r)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 70.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 70.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 70.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 70.5(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

39 Fed. Reg. 42,510 (Dec. 5, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

45 Fed. Reg. 52,676 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

57 Fed. Reg. 32,314 (July 14, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 11

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-294 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077  . . . . . . . . . . . . . . . . . . . .  14

136 Cong. Rec. 36083 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

This case is about six coal-burning power plants in and around Chicago that have disregarded their obligation to operate using state-of-the-art pollution controls required by the Clean Air Act.  Each day these plants operate, they emit sulfur dioxide, nitrogen oxides, and other pollutants into the air at a rate far in excess of what would occur if the plants were in compliance with the Act.  These excess emissions have caused, and continue to cause, substantial harm to human health and the environment.

Congress recognized the importance of controlling large sources of pollution like these power plants when it created the New Source Review ("NSR") program in 1977.  Under NSR, which includes the Prevention of Significant Deterioration ("PSD") program at issue here, new sources are required to obtain permits and install the best available pollution controls upon construction.  Existing sources were initially exempt from NSR requirements, but are required to get permits and install top controls whenever they make major modifications.  NSR was intended to require existing major sources of pollution that are modified to use cleaner, less polluting technology and to prevent those sources from continually rebuilding major components in order to avoid the more stringent NSR pollution limits.

Plaintiffs allege that the six plants at issue were modified under the statute between 1994 and 2000 and have never complied with PSD.  Under the PSD program, the modified plants must obtain permits that will provide for the installation and use of best available pollution controls. The permit that is issued under the PSD program establishes pollution limits for the unit's operation on a forward-going basis.  Contrary to Midwest Generation's ("Midwest Gen") argument that PSD is a set of *exclusively* pre-project requirements, the statute, regulations, and common sense make clear that PSD includes ongoing obligations for the operation of the units post-project.  Rather than a single, pre-project violation, the failure to comply with PSD constitutes an ongoing violation until the source is brought into compliance by obtaining a permit and installing and operating the required pollution controls.

With its motion, Midwest Gen seeks from the Court a license to continue to ignore the PSD rules that apply to every other source, and reap the economic benefits it has enjoyed.  The company's motion should be denied.

## ARGUMENT

The failure to comply with PSD thwarts the purpose of the Clean Air Act to require major sources to reduce their emissions.  While a PSD permit is a pre-project requirement, it sets the

conditions that the source must follow *during its operations*.  Put simply, avoiding PSD means that a source will emit more pollution – potentially many times more pollution – than it would have under the requirements established through PSD permitting. That additional pollution continues each day the source operates.  Thus, the harm to human health and the environment continues until the source obtains a permit and installs pollution controls.  Midwest Gen asks this Court for a free pass from PSD based on two unsupportable theories.  The first is that a PSD violation is a discrete event that occurs solely on the day when the project starts.  The second theory is that no injunctive relief for PSD violations can be allowed against a subsequent owner.  These theories are at odds with the language of the Clean Air Act and its implementing regulations.  They also run counter to the purpose of the statute and the PSD program by hindering efforts to maintain and improve air quality.

As Plaintiffs explain below, PSD violations are ongoing in nature.  This determination completely resolves Midwest Gen's motion:  if the violations are ongoing, injunctive relief and penalties are appropriate against Midwest Gen.[1]  Even if the violations are found to be discrete, however, injunctive relief is still appropriate against Midwest Gen.  It is important to note that while there is a split in the case law on whether PSD violations are continuing in nature – and thus whether penalties are possible – no court has barred injunctive relief sought by the United States for PSD violations.  To allow the sale of a pollution source to preclude injunctive relief, as Midwest Gen advocates, would place air quality and public health at the mercy of private business transactions.  Such a result is contrary to the law.

I.      **Standard Of Review**

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Complaint must be liberally construed in favor of the plaintiff, and the Court "must accept as true all of the factual allegations contained in the Complaint."  *See  Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

Additionally, it is a canon of statutory construction that statutes of limitation "must receive a strict construction in  favor of the Government."  *Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984); *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997), *cert. denied*, 522 U.S.

---

[1]  As noted *infra* at Section II.C, courts are split on whether the statute of limitations tolls five years after the completion of construction for PSD claims, and therefore precludes penalties.  This issue is anticipated to be on appeal in the Seventh Circuit in *United States et al. v. Cinergy Corp. et al.*, 09-3344, 09-3350, 09-3351.  Plaintiffs' opening brief is due February 12, 2010.

1075 (1998).  This rule is particularly important when a limitations provision would impede the government's ability to enforce a remedial statute intended to protect public health and welfare, because the latter are to be construed liberally to effectuate their important purposes.  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("familiar canon of statutory construction [is] that remedial legislation should be construed broadly to effectuate its purposes"); *Mullikin v. United States*, 952 F.2d 920, 926 (6th Cir. 1991) (administrative penalty assessments are not barred by the statute of limitation because of the court's narrow construction of 28 U.S.C. § 2462), *cert. denied*, 506 U.S. 827 (1992); *United States v. Telluride Co*., 146 F.3d 1241, 1244-45 (10th Cir. 1998) (injunctive relief sought by the government to restore wetlands illegally filled was not subject to the statute of limitations for penalties and forfeitures because 28 U.S.C. § 2462 should be narrowly construed); *E.I. Dupont Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924) ("[a]n action on behalf of the United States in its governmental capacity…is subject to *no time limitation*, in the absence of congressional enactment *clearly* imposing it") (emphasis added).

## II.     The PSD Program Imposes Continuing Obligations

The threshold question raised by Midwest Gen's motion is whether PSD violations are continuing in nature.  If the answer is yes, then the company's motion must be denied in full, and both injunctive relief and penalties are appropriate.

Midwest Gen's argument is based on a false dichotomy between PSD permits and source operation.  Contrary to the company's strained reading of the law, there is no firewall between PSD permits and operation.  Instead, the PSD permit is the vehicle for establishing the pollution limits that the unit must meet in operation.  A preconstruction permit, once issued, sets the operating conditions that must be complied with for the facility in question.  "[C]ompliance with these emission limitations is just as integral to achieving the objectives of PSD as the preconstruction analysis and review."  *United States v. Duke Energy Corp.,* 278 F. Supp. 2d 619 (M.D. N.C. 2003), *aff'd on other grounds*, 441 F.3d 539 (4th Cir. 2005), *4th Circuit vacated by, Ent'l Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) ("Duke Energy").  The plain language of the statute and regulations compel the conclusion that PSD imposes ongoing obligations on sources, a conclusion that is reinforced by the overall structure and purpose of the statute and the background of environmental law and common law upon which Congress acted.

**A.    The Statutory And Regulatory Language Demonstrates That PSD Imposes Ongoing Obligations On The Source**

Contrary to Midwest Gen's labored interpretation, the language of the PSD provisions themselves indicate that the program includes continuing requirements:  "The PSD program contemplates not only preconstruction requirements, but also ongoing operational requirements." *Sierra Club v. Portland Gen. Elec. Co.*, No. 08-1136-HA, 2009 WL 3245917, *7-8 (D.Or. Sept. 30, 2009); *see also Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 418-19 (6th Cir. 2007) ("*Nat'l Parks-Tenn.*").

The most relevant continuing requirement in this case is the ongoing requirement for the modified source to apply best available control technology (known as "BACT").  The PSD program bars modification of a unit unless it "is subject to [BACT]."  42 U.S.C. § 7475(a)(4). The statute defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant . . . which the permitting authority . . . determines is achievable."  42 U.S.C. § 7479(3).  The statute then defines "emissions limitation" as a "requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a *continuous* basis, including any requirement relating to the operation or maintenance of a source to assure *continuous* emission reduction."  42 U.S.C. § 7602(k) (emphases added).

The use of the word "continuous" in the statutory definition demonstrates that BACT is an ongoing requirement that does not apply only at the time of construction.  A source cannot be "subject" to a continuous emissions limit until it begins operations.  To give meaning to the BACT provision and the associated definitions, the facility must be required to meet its emissions limit after beginning operations.  *See, e.g.*, *Corley v. United States*, 129 S.Ct. 1558, 1566 (2009) ("'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (internal citations and quotation marks omitted).  "It makes little sense for a PSD permit to set emissions limitations and require pollution control technology, but not require a facility to operate pursuant to those restrictions."  *See Portland Gen. Elec.*, 2009 WL 3245917 at *7-8.

If a PSD permit *had* been issued for each of the alleged modifications, each permit would have set forth BACT requirements, and every day the unit failed to meet its permitted emissions limit would be a separate day of violation.  42 U.S.C. § 7413(b)(1).  The PSD permit applies to the source, and the owner or operator of the source would be liable for each day of violation of

the emissions limits set forth in the permit.  Under Midwest Gen's logic, a source would be better off avoiding the permitting program altogether, rather than getting a permit and potentially missing its limits on occasion.  This disparity cannot be squared with the importance and purpose of PSD permitting in the Clean Air Act.

In addition to the BACT requirement, the statutory PSD provisions include an explicit, ongoing monitoring obligation.  The statute states that:

> the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part *agrees to conduct* such monitoring as may be necessary to determine the effect which emissions from any such facility may have, *or is having*, on air quality in any area which may be affected by emissions from such source.

42 U.S.C. § 7475(a)(7) (emphasis added).  This provision on its face is prospective – the "is having" clause only makes sense if operation has begun – and applies to Midwest Gen as the company that owns and is currently operating, the major sources at issue.  *See Ala. Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (noting that statute includes "post-construction monitoring" requirement).  More important to the issue at hand, "*the statute itself provides for the requirement of a preconstruction permit as well as ongoing operation in compliance with CAA standards for sources 'for which a permit is required,' not simply those sources for which a permit has been granted.*"  *United States v. Ohio Edison Co.*, No. 2:99-cv-1181, 2003 WL 23415140, *5-6 (S.D. Ohio Jan. 17, 2003) (citing 42 U.S.C. § 7475(a)(7)) (emphasis added); *see also New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*, No. 07-CV-5298, 2009 WL 3234438, *16 (E.D.Pa. Sept. 30, 2009) (adopting *Ohio Edison* reasoning).

Other substantive provisions support viewing PSD violations as continuing.  Both the citizen and federal enforcement provisions of the Act impose civil penalties for *each day* a violation continues.  42 U.S.C. §§ 7413(b), 7413(e).  This treatment suggests a Congressional intent to provide for ongoing claims.  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996).

The ongoing nature of the PSD requirements is also reflected in the regulations EPA has established to implement the program – including the very EPA regulations that Illinois has adopted and that Midwest Gen appends to its brief.[2]  In one of the most telling examples of post-

---

[2]  The federal PSD regulations, 40 C.F.R. § 52.21, are wholly incorporated into the Illinois State Implementation Plan and constitute the Illinois PSD program.

construction PSD requirements, power plants that perform projects, but do not obtain PSD permits, are required to submit to regulators post-project emissions data for five years. *See, e.g.,* 40 C.F.R. § 52.21(b)(21)(v). If the data then show a significant increase in emissions as a result of the project, then "the source would become subject to [PSD] requirements at that time." 57 Fed. Reg. 32,314, 32,325 (July 14, 1992). This provision directly contradicts Midwest Gen's claim that PSD is applicable solely at the time of construction. *See, e.g.,* Def. Br. at 8.

Several other aspects of the rules suggest that PSD's reach does not end when construction begins. First, the rules state that modified units "*shall* meet each applicable emissions limitations" and "*shall* apply best available control technology." 40 C.F.R. §§ 52.21(j)(1), 52.21(j)(3) (emphasis added). The use of "shall" indicates an ongoing requirement, as the Sixth Circuit found with a similarly worded PSD provision in the Tennessee rules. 40 C.F.R. § 52.21(j)(1). Quite simply, operation of the unit with BACT installed is required to determine if the applicable emissions limit is being met. *Nat'l Parks-Tenn.*, 480 F.3d at 410, 418. An earlier version of the PSD rules stated that sources "will meet an emission limit" based on BACT, similar to the "shall meet" requirement in the applicable regulations.[3] 39 Fed. Reg. 42,510, 42,516 (Dec. 5, 1974). In explaining that provision, EPA stated that sources "must also meet" that emissions limit, confirming that EPA intended such language to impose an operating obligation, not merely a preconstruction duty. *Id.* at 42,512. Second, the rules allow EPA to require *post*-construction monitoring to be performed by the source. 40 C.F.R. § 52.21(m)(2) (emphasis added). Third, the rules state that any "owner or operator who constructs *or operates* a source or modification not in accordance with the application submitted pursuant to this section . . . shall be subject to appropriate enforcement action." 40 C.F.R. § 52.21(r)(1) (emphasis added). This last provision explicitly creates an ongoing obligation to operate consistently with the PSD permit application.

These rules impose continuing PSD obligations on their own *and* reflect EPA's formal interpretation of the statute as requiring PSD compliance throughout the source's operation. EPA's interpretation of the statute through its rules and regulations merits substantial deference under *Chevron*. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844. (1984). Courts have granted EPA particular deference in interpretation of the Clean Air Act and

---

[3] In response to a court decision, EPA promulgated PSD rules before Congress explicitly passed a PSD program in 1977. *See generally Ala. Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979).

EPA's own regulations under the statue due to the "technical and complex" nature of the subject. *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 906-07 (7th Cir. 1990).

The structure and purpose of the Clean Air Act reinforce the logic of treating PSD violations as ongoing. *See Duke Energy*, 278 F. Supp. 2d at 652 ("Holding that Duke Energy's alleged failure to obtain a preconstruction permit constitutes a continuing violation is consistent with the purpose of the CAA and the PSD provisions."). *Id.* at 651. Congress's intent that no modified source be allowed to operate without obtaining a permit and pollution controls is clear. *See, e.g.*, *Ala. Power*, 636 F.2d at 400. While clever defendants can try to find language implying loopholes, it would be contrary to the fundamental purpose of PSD to reward those who evaded the program by eliminating their PSD obligations:

> The [PSD rule] does not exempt a source of pollutants from new source review requirements simply because the 'major modification' was constructed prior to the issuance of a requisite permit. . . . [I]f such an exemption were allowed, a windfall would be created for those major new or modified sources that disregarded the SIP-mandated [PSD] requirements.

*Or. Envtl. Council et al. v. Or. Dep't of Envt'l Quality et al.*, No. 91-13-FR, 1992 WL 252123, *23 (D. Or. Sept. 24, 1992); *see also Portland Gen. Electric,* 2009 WL 3245917, at *8 ("Failure to obtain a permit in the first instance does not relieve an operator of the Act's ongoing operational requirements.").

### B.    Emission Limits Imposed Under The PSD Program Are Enforceable On A Continuing Basis Under Section 113 Of The CAA

In its brief, Midwest Gen places weight on the fact that the relevant statutory subsection is entitled "Preconstruction requirements" and on snippets of language that imply actions are to be taken before the modification. Such language proves little, however, except that the PSD requirements are *supposed* to be addressed before the project. Naturally the language anticipates that sources will comply with and perform the requirements beforehand. None of the language is relevant to the critical point here: in cases where the source fails to comply beforehand, does it escape doing so forever? As described above, the statutory and regulatory language makes clear that the obligation to comply with PSD continues post-project as well.

Midwest Gen's interpretation of Section 167 of the CAA, 42 U.S.C. § 7477, ignores the larger scheme and purposes of the Act. The company argues that, because the language of Section 167 refers to construction rather than operation, PSD lacks an enforcement mechanism for operating without a PSD permit. Def. Br. at 9-10. This argument ignores the overall

enforcement provision of the statute, Section 113, which grants enforcement powers whenever any person is "in violation of, any requirement or prohibition of an applicable implementation plan or permit."  42 U.S.C. § 7413(b)(1); *see also Marine Shale*, 81 F.3d at 1354 (noting Congress granted EPA, "broad authority to enforce state air permits" in 42 U.S.C. § 7413). There was no need for a specific provision to enforce the PSD permit requirement, as the legislative history confirms.[4]  *See* 136 Cong. Rec. 36,083, 36,084 (1990) (Senate managers' statement) (stating, with regard to the similarly structured governmental enforcement provisions, that the 1990 CAA amendments "confirm[] existing law," which allows EPA to "take[] enforcement action against operating sources that are in violation of [NSR] requirements" and to "halt the construction or modification of new sources that are violating new source review requirements"); *United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp. 2d 808, 813 (S.D. Ohio 2001) (Section 167 "can not reasonably be interpreted to limit by implication" EPA's authority under Section 113).  Section 167 adds to EPA's enforcement arsenal to allow the United States to prevent construction of a new source without a permit, but Section 167 does not detract from other enforcement options available under Section 113 of the Act.  In the only NSR case that has been resolved after a remedy trial, the court relied on Section 113 rather than 167 for its authority to order relief for PSD violations.  *See United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 959 (S.D. Ind. 2009).

Finally, the existence of the Title V operating permit program fails to support Midwest Gen's argument that the PSD program does not contain operating requirements.  *See* Def. Br. at 9-10 (citing 42 U.S.C. §§ 7661-7661f).  The Title V operating permit provisions were not added to the statute until 1990, 13 years after the PSD program was enacted.  Midwest Gen's argument that there was no mechanism for enforcing PSD operating requirements, such as BACT, for thirteen years is an illogical conclusion that is at odds with common sense and the purpose of the Clean Air Act.  Rather, the function of a Title V permit is to collect a source's applicable requirements appearing elsewhere in the CAA, including but not limited to PSD requirements, into a single permit.  *See* 42 U.S.C. § 7661c(a) and (b); *Duke Energy*, 278 F. Supp. 2d at 651-52. The provisions of Title V generally "do not impose substantive new requirements."  40 C.F.R.

---

[4]  Instead, the purpose of Section 167 is to make clear that EPA has the enforcement authority "to *prevent* the construction or modification" of a non-compliant source rather than wait until a source constructs and thus is clearly out of compliance.  *See* 42 U.S.C. § 7477 (emphasis added).

§ 70.1(b); *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1348-49 (11th Cir. 2006). The Title V program therefore cannot properly be viewed as the operating permit arm of the PSD program for enforcement purposes. The PSD program's ongoing operational requirements must be included in a source's Title V permit, but those operating requirements exist and are enforceable independently, by virtue of the PSD provisions of the CAA and the enforcement provisions of Section 113, 42 U.S.C. § 7413.[5] In suggesting that the PSD program's operating requirements derive from Title V, instead of from the PSD provisions themselves, Midwest Gen misconstrues the relationship between the two programs, and fails to recognize that the PSD program itself creates ongoing operational requirements.

### C. The Case Law Supports Plaintiffs' Interpretation That A Violation Of PSD Requirements Constitutes An Ongoing Violation Of The CAA

While the district court case law is evenly split,[6] two of the three circuit courts to consider the issue have found that the failure to obtain Clean Air Act preconstruction permits

---

[5] Sources that trigger PSD requirements are independently obligated to identify such applicable requirements in their Title V permit applications, which must then be approved by the applicable permitting authority. *See* 40 C.F.R. §§ 70.2, 70.5(a), 70.5(c). If Midwest Gen were correct that PSD permits include no operating requirements, then such a source would operate *without any PSD emissions limits* until its Title V permit was approved. Such a result would be untenable, because it directly contradicts the statutory command that each source subject to PSD apply BACT. 42 U.S.C. § 7475(a)(4). Plaintiffs note that Midwest Gen's motion does not challenge Plaintiffs' separate claims alleging that Midwest Gen failed to submit complete Title V permit applications. *See* Complaint Counts 3, 6, 9, 12, 15, 17, 20, 23, 26, 29, 31, 33, 35, and 38. Such violations are independently actionable under the broad enforcement authority provided by the Clean Air Act. *See United States v. E. Ky. Power Coop.*, 498 F. Supp. 2d 1010, 1016-17 (E.D. Ky. 2007).

[6] The following courts have found continuing violations: *Nat'l Parks-Tenn.*, 480 F. 3d at 415-419; *United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996); *Sierra Club v. Portland Gen. Elec. Co.*, No. 08-1136-HA, 2009 WL 3245917, at *7-8 (D.Or. Sept. 30, 2009); *New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC*, No. 07-CV-5298, 2009 WL 3234438, at *16 (E.D.Pa. Sept. 30, 2009); *United States v. E. Ky. Power Coop.*, 498 F. Supp. 2d 970, 974-75 (E.D. Ky. 2007); *United States v. Cemex Cal. Cement LLC*, No. 07-223, slip op., at pp. 3-12 (C.D. Cal. July 10, 2007) (EXHIBIT A); *Sierra Club v. Dayton Power & Light, Inc.*, No. 2:04 CV 905, 2005 WL 1972549, at *3-4 (S.D. Ohio Aug. 12, 2005); *Duke Energy*, 278 F. Supp. 2d at 649-652; *United States v. Ohio Edison Co., No.* 2:99-CV-1181, 2003 WL 23415140, at *5-6 (S.D. Ohio Jan. 17, 2003); *United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp. 2d 808, 811 (S.D. Ohio 2001); and *United States v. Titanium Metals Corp.*, No. CV-S-98-682-HDM (RLH), slip op. (D. Nev. Sept. 16, 1998) *(EXHIBIT B)*.

Three cases Midwest Gen cites are inapposite. Neither *Franklin County Power* nor *CleanCOALition v. TXU Power* address the issue raised here. In *Franklin County Power*, the Seventh Circuit was addressing an entirely different issue and the language cited by Midwest Gen was simply to distinguish another case from the situation before the court. Def. Br. at 8 (quoting *Sierra Club v. Franklin County Power*, 546 F.3d 918, 928 (7th Cir. 2008)). Similarly, *CleanCOALition* simply noted

creates an ongoing violation.  In the first case, a facility failed to apply for minor NSR preconstruction permits[7] before beginning unit operation.  The Fifth Circuit called the claim that the statute of limitations barred assessment of penalty for failure to obtain a preconstruction permit "frivolous."  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996).  The Sixth Circuit reached the same conclusion, holding that failure to operate in compliance with PSD emissions limitations constituted a recurring violation that "manifests itself anew each day a plant operates without BACT limits on emissions."  *Nat'l Parks Conservation Ass'n. v. Tenn. Valley Auth.*, 480 F. 3d at 418-419 (6th Cir. 2007) ("Nat'l Parks-Tenn.").  While the court there was applying Tennessee regulations, the basis of its holding is applicable here.  The court emphasized a Tennessee regulation that modified plants "*shall* apply" BACT and found that the language "create[d] an ongoing obligation to apply BACT."  *Id.* at 418 (emphasis supplied by Sixth Circuit).  The same language that the Sixth Circuit relied on is included in the EPA regulations that apply in Illinois.  *See* 40 C.F.R. § 52.21(j)(3) ("A major modification shall apply best available control technology . . .").

The sole circuit court case supporting Midwest Gen's argument is based on language in the early 1980s Alabama regulations that is not present here.  *See Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 502 F. 3d 1316 (11th Cir. 2007) ("*Nat'l Parks-Ala.*").  The Eleventh Circuit stated that if the Tennessee regulations applied, the "Sixth Circuit's decision [cited above] . . . would be persuasive authority" but that the Alabama regulations before it differed.

---

the Eleventh Circuit's *Nat'l Parks-Ala.* decision in passing.  *CleanCOALition  v. TXU Power,* 536 F.3d 469, 478 (5th Cir. 2008).  In *United States v. Louisiana-Pacific Corp.*, the court was determining whether minor NSR permits pre-dated the projects, not whether any violations were ongoing.  *United States v. La.-Pac. Corp.*, 682 F. Supp. 1122, 1130 (D. Colo. 1987).  In fact, the court later found the requirements on-going, holding that "the requirements of the program have been met only upon receipt of PSD permits . . . As a result, the PSD framework *still remains to be complied with in this case*."  *United States v. La.-Pac. Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988) (emphasis added).

The following courts have found that there is not an ongoing violation:  *Nat'l Parks-Ala.*, 502 F.3d at 1324; *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003); *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 444 (D. Md. 2001); *United States v. S. Ind. Gas & Elec. Co.*, 2002 WL 1760752, *5 (S.D. Ind. July 26, 2002); *United States Dist. Court v. Campbell Soup Co.*, No. CIV-S95-1854, 1997 WL 258894 (E.D. Cal. Mar. 11, 1997); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1083-84 (W.D.Wis. 2001); and *Sierra Club v. Otter Tail Corp.*, 608 F. Supp. 2d 1120, 1127 (D.S.D. 2009).

[7]  Minor NSR permits are required for sources that lack the potential to emit as much as major sources like those at issue here.  *See* 42 U.S.C. § 7479(1).

*Id.* at 1324.  Specifically, the Eleventh Circuit found that the Tennessee regulations explicitly allowed for a permit to be issued after the project while the Alabama regulations did not.  *Id.* at 1325.  The court described this as the "important difference" that "precludes us from reaching the same result."  *Id.*  The Eleventh Circuit thus placed paramount importance on whether the regulatory program includes any provision for *post*-project permitting.  As described above, the EPA regulations applied in Illinois include just such a mechanism by requiring units that show an actual increase in emissions after the project to go through PSD permitting at that time.  *See* 40 C.F.R. § 52.21(b)(21)(v); 57 Fed. Reg. 32,314, 32,325 (July 14, 1992).  As EPA explained when promulgating the original PSD rules, "Any source which improperly avoids review and commences construction *will be considered in violation of the applicable SIP and will be retroactively reviewed under the applicable NSR regulation*."  45 Fed. Reg. 52,676, 52,725 (Aug. 7, 1980)(emphasis added).  EPA's 1980 statement issued ten years before enactment of the Title V operating permit program clearly indicates that a source without a PSD permit stands "in violation" of the statute and is thus subject to enforcement under 42 U.S.C. § 7413(b), which grants EPA the authority to bring claims against any person who "*is in violation of*, any requirement or prohibition of an applicable implementation plan or permit."  EPA's 1980 interpretation set forth in the preamble to the PSD rules is entitled to strong deference.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 906-07 (7th Cir. 1990).  Contrary to the basis for the Eleventh Circuit's finding in *Nat'l Parks-Ala.*, EPA has always provided for post-hoc permitting when necessary.

Notably, even the Eleventh Circuit decision and the other cases cited by Midwest Gen agree that operation without a permit that imposes *operating* obligations would constitute a continuing violation.  *See, e.g.*, *Nat'l Parks-Ala.*, 502 F. 3d at 1326 (finding that plaintiffs' recourse was to bring claims under operating permit).  As discussed above in Section II.A., under the Clean Air Act and its implementing regulations, it is clear that the PSD provisions *do* impose continuing obligations, and thus the failure to comply with PSD results in ongoing violations of the statute.

Similarly, in construing other environmental laws, numerous courts have held that the failure to obtain regulatory approval for a prohibited activity gives rise to a violation that continues until a defendant's operations come into compliance.  *See Newell Recycling Co. v. U.S. EPA,* 231 F.3d 204 (5th Cir. 2000) (stockpiling PCB-contaminated soil is an ongoing violation of

TSCA); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1063 (5th Cir. 1991) (a discharger operating without a Clean Water Act permit "remains in a continuing state of violation until it either obtains a permit or no longer meets the definition of a point source"); *Harmon Indus., Inc. v. Browner*, 19 F. Supp. 2d 988, 998 (W.D. Mo. 1998) (operation of hazardous waste site without a permit is a continuing violation under RCRA; environmental regulations "are not meant to reward long term repetitive violators . . . who escape getting caught within the five year statute of limitations."), *aff'd*, 191 F.3d 894, 904 (8th Cir. 1999) (noting that the statute of limitations defense "entirely lacks merit").

These cases are consistent with non-environmental cases which similarly noted that the failure to obtain regulatory approval before beginning an activity creates a continuing violation. In *Interamericas Investments, Ltd. v. Board of Governors of the Federal Reserve Sys.*, foreign investors gained control of a U.S. bank outside the applicable five year statute of limitations. *Interamericas Invs., Ltd. v. Board of Governors of Fed. Reserve Sys.,* 111 F.3d 376, 383 (5th Cir. 1997). The Bank Holding Company Act ("BHCA") prohibited the acquisition and retention of a United States bank without approval by the Federal Reserve Board. The Fifth Circuit held:

> *So long as the approval has not been received, such control is in violation of the Act.* . . Among other violations, this continued control constituted a continuing violation actionable under the BHCA . . . . In sum, the BHCA — and indeed, common sense — preclude control of a bank, in violation of the BHCA, simply because such continuing control began more than five years before the Board initiated action.

*Id*. at 383 (emphasis added). The same logic applies here.

## III. Penalties Are Appropriate If PSD Violations Are Deemed Continuing

Unlike injunctive relief, penalties are only appropriate if the Court agrees that PSD violations are continuing in nature: each court that found that violations were continuing ruled that penalties were allowed, while each court finding a discrete violation found no penalties could be awarded. The Parties agree that the appropriate limitations period for the Governments' penalty claims is five years. As described above, the violations at issue here continue until Midwest Gen comes into compliance with the law by either (i) obtaining a permit and installing the necessary pollution controls or (ii) ceasing to operate the units. Therefore, for the reasons set forth in Section II, the Governments are entitled to penalties for the period beginning five years

prior to filing the complaint.[8]   Those courts that have found ongoing violations have adopted this approach.  *See, e.g.*, *Duke Energy*, 278 F. Supp. 2d at 653.

In addition, allowing penalties in this case is consistent with the statutory canon of construction that statutes of limitations, "must receive a strict construction in favor of the Government."  *Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984); *United States v. Greene-Thapedi*, 398 F.3d 635, 637-38 (7th Cir. 2005).  "Statutes of limitation . . . are intended to keep stale claims out of the courts.  Where the challenged violation is a continuing one, the staleness disappears."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (citation omitted); *see also Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 408-09 (6th Cir. 1999).

In an analogous case, the Supreme Court has offered guidance to courts determining whether a violation is continuing for statute of limitations purposes.  In *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975), the Court held that a Federal Trade Commission order forbidding the "acquisition" of certain companies should be interpreted so that each day of retention of the acquired company constituted a new day of violation.  The Court held that the violation continued because "the detrimental effect to the public and the advantage to the [defendant] continue and increase over a period of time, and the [defendant] could eliminate the effects of the violation if it were motivated to do so, after it had begun."  *Id.* at 231.  This logic is equally applicable here.

By contrast, Midwest Gen's argument essentially reduces any PSD violation to a one-day event.  *See* Def. Br. at 14 (PSD violation occurs on date modification began).  The maximum statutory penalty is currently $37,500 per day.  40 C.F.R. § 19 (2009).  The pollution controls required by BACT can cost hundreds of millions of dollars.  Adopting Midwest Gen's interpretation would create a tremendous incentive for companies to attempt to evade PSD and would make it impossible to meet the statute's directive that penalties address "the economic benefit of noncompliance."  *See* 42 U.S.C. § 7413(e)(1); *Duke Energy*, 278 F. Supp. 2d at 652 (under defendant's argument "it could in certain circumstances be more cost-effective to avoid

---

[8]  Midwest Gen ignores the proper application of this five-year period, and incorrectly asserts that a continuing violation theory would mean no practical statute of limitations.  In addition, the company could have halted the violation at any time by obtaining a PSD permit and installing pollution controls.  Such permits can be issued after the modification when necessary.  *See Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1561, 1562-63 (N.D. Ga. 1994) (source realized after construction that it triggered PSD so it "paid penalties, conducted additional emissions testing, underwent complete PSD review, and considered and installed additional emissions control technology at the plant.").

the permit obligations altogether and, if challenged, litigate the claim endlessly with little incentive to settle and no downside risk of an increasing fine."); H.R. Rep. No. 95-294, at 70 (1977); *reprinted in* 1977 U.S.C.C.A.N. 1077, 1148 ("Since the committee viewed the civil penalty as primarily remedial in purpose, the committee also intends that the penalty be assessed in amounts which are adequate to assure compliance will result[.]").

## IV.   Injunctive Relief Is Appropriate Whether Or Not The Violations Are Continuing

Whether or not the Court finds that PSD violations are continuing, no court has ever precluded injunctive relief for a PSD claim brought by the United States. Midwest Gen does not claim that any statute of limitations applies to Plaintiffs' injunctive claims, but rather that it cannot be held liable because it was not the owner or operator at the time of the projects at issue.[9] This argument contravenes both the express language of the statute and the Court's inherent equitable authority.

### A.   The Court Has Authority To Order Injunctive Relief

Midwest Gen bases its argument on the claim that the relevant Illinois rules do not specifically allow for enforcement against subsequent owners or operators. Def. Br. at 11-13. This is both incorrect and beside the point. First, Midwest Gen is simply incorrect in its claim that the Illinois PSD rules "impose only three obligations." Def. Br. at 13. As explained in Section II above, the statute and regulations clearly impose ongoing obligations on any owner or operator of a modified source. Second, the Clean Air Act explicitly provides for current owner and operator liability. Finally, the Court has the inherent equitable authority to do complete justice. Since the founding of the nation, it has been "a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury*

---

[9]  The company's brief appears to argue only that injunctive relief is not available against it as a subsequent owner, not that injunctive relief is unavailable when the statute of limitations has run. *See, e.g.*, Def. Br. at 2. To the extent Midwest Gen is heard to argue that injunctive relief is precluded simply because of the passage of time, its own cited cases reject such a claim. For example, the *Illinois Power* court found that "nothing in the Clean Air Act or 28 U.S.C. § 2462 precludes the Government from seeking injunctive relief beyond a five year statute of limitations." *United States v. Illinois Power Co.*, 245 F. Supp. 2d 951, 957 n.3 (S.D. Ill. 2003) (citing *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1087 (W.D.Wis. 2001)); *see also United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1031-32 (S.D. Ind. 2005) (allowing government to seek injunctive relief and noting that, "Traditionally, statutes of limitations are not controlling measures of equitable relief.") (internal citations and quotation marks omitted).

*v. Madison*, 1 Cranch 137, 147 (1803); *see also United States v. Cinergy,* 582 F. Supp. 2d 1055, 1060 (S.D. Ind. 2008).  Here there can be no proper redress without injunctive relief.

The enforcement language of the Clean Air Act provides ample authority for ordering injunctive relief against Midwest Gen.  Contrary to Midwest Gen's claims, as described above in Section II.A., there are several aspects of the federal and Illinois PSD rules that require continuing compliance by the source indicating installation and operation of BACT and post-project emissions monitoring.  Even more importantly, the statute authorizes injunctive relief against any person who "has violated, *or is in violation of*, any requirement or prohibition of an applicable implementation plan or permit."  42 U.S.C. § 7413(b) (emphasis added).  Whether or not PSD is a continuing obligation, the program is clearly a requirement of the Illinois SIP and Midwest Gen is alleged to be in violation of that requirement.[10]  To argue, as Midwest Gen does, that only those who performed the modification can be the subject of enforcement would be to render superfluous the "in violation" language, contrary to the rules of statutory construction. *See, e.g.*, *Corley v. United States*, 129 S.Ct. 1558, 1566 (2009).  Moreover, nothing in the statute or regulations suggests that a change of ownership creates a free pass for a source that failed to comply with PSD.

Allowing injunctive relief even if ownership changes hands is consistent both with the purposes of the Clean Air Act and PSD program and the traditionally broad scope of equitable authority vested in the courts.  The fundamental structure of PSD is that while existing sources are initially "grandfather[ed]" Congress did not intend "a perpetual immunity from all standards under the PSD program." *Ala. Power Co. v. Costle*, 636 F.2d 323, 400, (D.C. Cir. 1979).  As the *Alabama Power* court stated, *"*If these plants increase pollution, they will generally need a permit." *Id.*  Nowhere did Congress give any indication that modified plants would need a permit *unless* they were sold.

Moreover, nothing in the Clean Air Act restricts the Court's inherent equitable authority or its charge to "secure complete justice." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (internal punctuation and citations omitted).  Federal district courts have broad equitable authority that can only be curtailed by "a clear and valid legislative command." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *Town of Munster, Indiana v. Sherwin-Williams*

---

[10] As Plaintiffs describe above in Section II.C, EPA has clearly stated that SIP PSD violations do result in a source being "in violation" of the Act.

*Co., Inc.*, 27 F.3d 1268, 1271 (7th Cir. 1994).  A district court's equitable authority is at its apex when the public interest is involved.  In such cases, a district court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter*, 328 U.S. at 398.  The Clean Air Act does nothing to limit courts' equitable authority. *Cinergy*, 582 F. Supp. 2d at 1060.

Midwest Gen argues that certain Illinois regulatory language *implies* that relief is not available against subsequent owners.  As Plaintiffs note above, any such language is contradicted by other provisions in those same regulations.  More importantly, however, the language and purpose of the PSD program and the traditionally broad equitable authority invested in the Court mean that the ability to grant injunctive relief should be the starting assumption, one that only a definitive statement from Congress can repudiate.  *See Town of Munster,* 27 F.3d at 1271 (citing *Porter*, 328 U.S. at 398).  There is no such repudiation in the Clean Air Act.  Thus the Court has at its disposal the full scope of injunctive relief, including an injunction against Midwest Gen.

Plaintiffs are aware of two decisions that addressed the scenario before the Court.  The most recent decision found that an "operator may be held liable for failure to comply with CAA standards simply because its predecessor owner failed to secure the appropriate permit." *New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*, No. 07-CV-5298, 2009 WL 3234438, at *16 (E.D. Pa. Sept. 30, 2009).  The *Reliant* holding is consistent with the unanimous line of cases holding that the United States can seek injunctive relief for PSD violations – even where the statute of limitations has expired and the court barred recovery of penalties.  *See Ill. Power*, 245 F. Supp. 2d at 957 n.3; *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1087 (W.D. Wis. 2001); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1031-32 (S.D. Ind. 2005).  In arguing for the opposite result, Midwest Gen cites *Niagara Mohawk*.  Def. Br. at 12 (citing *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003).  However, the *Niagara Mohawk* court based its decision on the finding that the PSD-specific enforcement provision, 42 U.S.C. § 7477, did not impose liability on subsequent owners or operators.  *Niagara Mohawk,* 263 F. Supp. 2d at 668-69.  The court did not consider the primary enforcement provision, 42 U.S.C. § 7413(b), which explicitly allows EPA to enforce against any person who "is in violation of" any requirement, specifically including PSD.  *See* Section II.C. *supra;* H.R. REP. 101-490(I) ("Since 1970, the principal enforcement tool of the Clean Air Act has been section 113").  Therefore, in addition to be wrongly decided on the issue of continuing

violations, *Niagara Mohawk* is not useful precedent on the issue of current owner/operator liability.

Plaintiffs' argument that relief is available against Midwest Gen applies whether the Court finds PSD violations are continuing or not.  If the violations are continuing, then injunctive relief must be available against Midwest Gen.  Otherwise a continuing violation simply has no meaning.[11]  Midwest Gen's argument that even continuing PSD requirements cannot be imposed on a subsequent owner or operator reveals the underlying flaw in Midwest Gen's motion to dismiss.  The company argues that certain language in the EPA PSD rules used in Illinois *preclude* injunctive relief against a subsequent owner and operator.  But the PSD rules of a state cannot repudiate the command of the statute or a federal Court's injunctive authority.  Moreover, the rules at issue here were written by EPA, and EPA has made clear that they include injunctive relief for PSD violations.  *See* Section II.C. *supra.*  Midwest Gen's interpretation of the rules cannot be correct, because it cannot be squared with other, controlling sources of law.  Because the company relies on that same, flawed interpretation of the EPA-written Illinois PSD rules to argue that injunctive relief is unavailable if the violations are discrete, that argument is groundless as well.  *See* Def. Br. at 12 (in arguing against injunctive relief where violations are found to be discrete, claiming that no Illinois rule provides for subsequent owner liability).

**B.      Injunctive Relief Is Appropriate Here In Order To Require Installation And Operation Of Pollution Controls That Would Have Been Required In A PSD Permit**

Compliance with the Clean Air Act can only be achieved here by requiring Midwest Gen to bring its units into compliance with all PSD requirements, including those related to pollution controls and emissions limitations.  As the current owner/operator, Midwest Gen is the only entity that can implement the appropriate relief:  reducing emissions from the violating units by installing BACT-level pollution controls or shutting the units down.[12]  Indeed, the *Reliant* court dismissed claims against the prior owner in that action, finding that the prior owner could not

---

[11]  Midwest Gen's argument would logically suggest that if the violations are continuing that a penalty is available but injunctive relief is not.  This turns on its head the traditional rule in actions by the United States and is particularly absurd given the emphasis in the Clean Air Act on air quality improvements.

[12]  Midwest Gen argues that even if its plants escape PSD, there are other means to address air quality.  Def. Br. at 13-14.  The company suggests that Illinois could modify its SIP to address the violating units.  But modifying the SIP would not constitute compliance with PSD requirements.  And, it is hardly a proper use of government resources for Illinois to change its SIP, which has the force of state law and must be approved by EPA, in order to achieve reductions already required by existing law.

implement pollution controls at the plant. *New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC,* No. 07-CV-5298, 2009 WL 3234438, at *17 (E.D. Pa. Sept. 30, 2009).

In addition, in any corporate sale, transfer, or merger, particularly between two sophisticated companies like ComEd and Midwest Gen, appropriate allowance is made for potential liabilities – such as environmental compliance obligations – in the terms of the transaction. Here, the nature of any arrangement between ComEd and Midwest Gen is a factual one that precludes resolution at the Rule 12(b)(6) stage. For example, the law makes clear that a successor may be held liable if it expressly or impliedly assumes liabilities under an asset purchase agreement. *See Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168 (5th Cir. 1985); *U.S. Bank Nat'l Ass'n. v. U.S. EPA,* 563 F. 3d 199 (6th Cir. 2009); *Phila. Elec. Co. v. Hercules, Inc.,* 762 F. 2d 303 (3rd Cir. 1985). Midwest Gen's recent SEC filings make clear that the Asset Purchase Agreement with ComEd included a transfer of at least some environmental liabilities between the companies. *See United States Securities and Exchange Commission, Midwest Generation, LLC, Form 10-Q,* at p.16 (Nov. 6, 2009) (discussing asbestos liability).[13] Whether and to what extent an asset transfer agreement would encompass the types of claims at issue are important factual questions that deserve resolution before Midwest Gen's motion for an abstract legal ruling that could well be mooted by facts developed in discovery.



---

[13]  Available at http://phx.corporate-ir.net/phoenix.zhtml?c=85474&p=irol-secEdison.

[14]

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Further, Midwest Gen's view of the law would be unworkable in practice. If it were so that the sale of a plant from one entity to another wiped the slate clean of PSD violations and precluded injunctive relief, the law would create an incentive to modify plants and then sell them to avoid PSD. Congress could not have intended for private business transactions to create this type of broad loophole in such an important aspect of the Clean Air Act.

Moreover, this Court has the discretion to tailor the injunctive relief to address the fact that Midwest Gen was not the owner at the time of the modifications, to the extent it is reasonable to do so after hearing all the facts. There is no reason to preclude injunctive relief altogether at the outset of the case.

Finally, any unfairness to Midwest Gen must be weighed against the unfairness to the public that has suffered from years of excess pollution as a result of the failure to comply with the law. The health of people in Chicago and other areas downwind should not be further harmed simply because the source of the pollution changed hands.

## CONCLUSION

As alleged in Plaintiffs' complaint, Midwest Gen owns and is operating six coal-fired power plants that are harming human health and the environment as a result of their failure to comply with federal law. The harm from these violations will continue until the units obtain PSD permits and install state-of-the-art pollution controls. The failure to comply with the PSD permitting program is a continuing violation and both injunctive relief and penalties are appropriate. Defendant's motion should be denied in its entirety.

Respectfully Submitted,

PLAINTIFF UNITED STATES OF AMERICA

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Dated: January 15, 2010                    /s/ Jennifer A. Lukas-Jackson
                                           JENNIFER A. LUKAS-JACKSON

19

KRISTIN M. FURRIE
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Phone:  (202) 305-2332
Facsimile:  (202) 514-8395

OF COUNSEL:
SUSAN TENNENBAUM
CHARLES MIKALIAN
Associate Regional Counsels
Office of Regional Counsel (C-14J)
U.S. EPA, Region V
77 W. Jackson Blvd.
Chicago, IL  60604-3590

PATRICK J. FITZGERALD
United States Attorney for the
Northern District of Illinois

JONATHAN HAILE
Assistant United States Attorney
Northern District of Illinois
219 S. Dearborn St., Fifth Floor
Chicago, IL  60604


PLAINTIFF STATE OF ILLINOIS

LISA MADIGAN
Attorney General


/s/ Matthew J. Dunn
MATTHEW J. DUNN, Chief
Environmental Enforcement/
Asbestos Litigation Division
Assistant Attorney General
69 W. Washington St., 18th Floor
Chicago, IL  60602
Phone:  (312) 814-2521
Facsimile:  (312) 814-2347

OF COUNSEL:
ROSEMARIE E. CAZEAU
STEPHEN SYLVESTER
Assistant Attorneys General
69 W. Washington St., 18th Floor
Chicago, IL  60602

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on January 15, 2010, a copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS** was filed electronically with the Clerk of Court using CM/ECF which will send notification of such filings to the following Counsel of Record:

*Attorneys for the State of Illinois*

Matthew J. Dunn
Rose-Marie Cazeau
Stephen J. Sylvester
Assistant Attorneys General
State of Illinois
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-2521

*Attorney for the Natural Resources Defense Council, Inc.*

Shannon Fisk
Natural Resources Defense Council
2 N. Riverside Plaza, Suite 2250
Chicago, IL 60606
(312) 651-7904

*Attorney for The Environmental Law and Policy Center and Respiratory Health Association of Metropolitan Chicago*

Faith E. Bugel
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1300
Chicago, IL 60601-2110
(312) 673-6500

Michael Christopher Soules
Environmental Law & Policy Center
700 Douglas Ave. #906
Minneapolis, MN 55403
(989) 600-2659

*Attorneys for Midwest Generation, LLC*

Daniel E. Reidy
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois 60601-1692
(312) 782-3939

James M. Jones
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania 15219-2514
(412) 391-3939

Kevin P. Holewinksi
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939

*Attorney for Citizens Against Ruining the Environment and The Sierra Club*

Keith Harley
Chicago Legal Clinic
205 W. Monroe, Floor 4
Chicago, IL 60606
(312) 726-2938

 */s/ Jennifer A. Lukas-Jackson*
Jennifer A. Lukas-Jackson